IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

-oOo-


THE UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　　)Case No. 3:25-CR-00431-RAM-MDM
　　　　　　　　　　　　　　　　　　)
-vs-　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
DANIEL GARCIA-MARTIN,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　　　)
_____)


TRANSCRIPT OF DETENTION HEARING
VIA DCR
HELD BEFORE MAGISTRATE JUDGE MARSHAL D. MORGAN
UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
THURSDAY, OCTOBER 23, 2025
_____


A P P E A R A N C E S

FOR THE UNITED STATES OF AMERICA:

AUSA Linet Olinghouse

FOR THE DEFENDANT:

AFPD Jessica Earl

UNITED STATES PROBATION OFFICERS:

Idaliz Ortiz
August Castro

STAFF INTERPRETERS:

Dennise Serrano
Maria Ceballos

Transcribed by:  Cindy Lee Brown, CSR, RPR, FCRR

(Proceedings commenced at 2:14 p.m.)

-oOo-

THE COURTROOM DEPUTY CLERK:  Magistrate Case 25-953, United States of America versus Daniel Garcia-Martin, for a detention hearing.  On behalf of the government is AUSA Linet Olinghouse.  On behalf of the defendant is AFPD Jessica Earl.  The defendant is present in the courtroom and being assisted by a certified court interpreter.

THE COURT:  All right.  Good afternoon.

Government ready to proceed?

MS. OLINGHOUSE:  Yes, Your Honor, we are.

THE COURT:  All right.

MS. EARL:  Good afternoon, Your Honor.  AFPD Jessica Earl on behalf of Mr. Garcia, and we're also ready to proceed.

THE COURT:  Okay.  All right.  Has the government received a copy of the pretrial services report?

MS. OLINGHOUSE:  Yes, Your Honor, we have.

THE COURT:  Have you, Ms. Earl?

MS. EARL:  Yes, Your Honor.

THE COURT:  All right.  I mean, this is certainly not a presumption case.

Ms. Earl, are you going to be arguing in favor of conditions?

MS. EARL:  Yes, Your Honor.

THE COURT:  All right.  Then let me hear from the

government, please.

MS. OLINGHOUSE: Yes, Your Honor.

In this case, we are requesting detention based on danger to the safety of the community, as well as flight risk. We begin by stating that while we recognize the pretrial services report recommends that there are conditions of release that can be fashioned, we know, as is mentioned in the report itself, a lot of the information, if not most of it, is unverified.

And the government, as it will present to the Court shortly, has information that contradicts or is lacking from the pretrial services report. As to danger to the safety of the community, Your Honor, first, by going with the 3142(g) factors, we note the nature and the circumstances of the offense.

In this case, the defendant was charged by Complaint with four firearms. However, we would like to clarify -- and we have talked to Ms. Earl about this -- it's actually three firearms, Your Honor, not four.

However, it is still 143 rounds of ammunition, which is a significant number of ammunition for any firearms, let alone for somebody who is a prohibited felon, who shouldn't have even one. So in this case, we have three firearms and 143 rounds of ammunition.

Going to another factor, Your Honor, we go towards

weight of the evidence. In this case, all of the items were recovered in the defendant's home, in his bedroom, so the firearms were in his bedroom. In close access, the ammunition was located right next to the firearms. We note that these items were recovered pursuant to a federal search warrant, which we believe goes to the weight of the evidence.

In addition to that, Your Honor, we have admissions from him, while the search warrant was being executed, stating that the firearms and the rounds of ammunitions belonged to him. In addition to that, we also have admissions from his consensual partner, who was living with him at the home, stating that the firearms do not belong to her, and the ammunitions do not either.

As far as history and characteristics, Your Honor, we believe that this is a very dangerous individual. We turn to his prior convictions, which are in the pretrial services report, and include a conviction for second-degree murder. We note that while the conviction may be from 1998, this conviction was when Defendant was 40 years old.

So unlike many of the defendants that appear before the Court, who especially appear in firearms cases, that are 18 years old, have offenses that they committed when they were very young, and are currently very young, this is a murder that was committed at 40 years old, Your Honor. This was an adult who made that decision at that time.

In addition to that, there is also, as stated in the pretrial services report, a charge for threats, which is as recent as 2011. Once again, Your Honor, we note that this was a charge and not a conviction, at 53 years old.

So, again, this is not a defendant that stands before you that is young, immature, does not know what he's doing. These are very much informed decisions.

Your Honor, going to the discrepancies in the pretrial services report, we believe, given the information that we've recovered from the Puerto Rico Police Bureau, there are other charges that are missing from his criminal history, very significant charges. One of them being a violation of [non-English language], another firearms charge, dating back to 1994, again, a full adult at the time that this happened.

And we believe that there is also a discrepancy that was reported by the defendant to the U.S. Probation Office regarding his second murder. So there is the first murder conviction when he was 40 years old, which is reflected, and the pretrial services report states that he committed a second murder.

According to the defendant's information that he provided to probation, which, again, is unverified, he told the probation office that he reported committing a murder when he was 14 years old. However, Your Honor, he gave the FBI agents very different information as to that second murder.

As to the second murder, he told the FBI agents that he committed this murder as an adult, at 18 years old, and we note that his Puerto Rico Bureau, Police Bureau, record of arrest states that the arrest for the murder was, in fact, in 1976, when the defendant was 18 years old. So going by the information that he gave the FBI agents, the information reflected on his criminal history record from the Puerto Rico Police Bureau, it appears that he committed his first murder at 18, his second murder at 40.

And even though the first murder is not reflected as a conviction, he clearly admitted that murder to FBI agents, as well as the probation office. Although, he did inform the probation office he did it at 14 and was on probation. Again, none of this information has been verified, Your Honor, and we believe is contradicted by the information that the government is proffering right now.

In addition to a very lengthy history of violent arrests, violent convictions, it doesn't get much more violent than two murders that he admitted to. There is also a prior history of drug use, drug use which includes crack and heroin.

Defendant states that he has been sober for, approximately, 10 years. Again, information that has been unverified. These are very serious drug addictions that we believe the Court should take into account.

Lastly, going to the nature and the seriousness and

the danger to the community, we note again this is a very violent person, a very lengthy history, with murders, threats, possession of firearms, in addition to the three he had, and the 143 rounds of ammunition. This is someone that, he has already shown the Court that he can't comply with conditions of release.

This is someone that served 12 years in jail for murder, admitted that he knew he couldn't possess firearms, and yet, he was possessing firearms. The very fact that he was released from prison as a convicted murderer and still possessed firearms is just a reflection of his respect for the law and his ability to comply with the law. We believe, if he couldn't comply then, he certainly cannot comply now.

And, once again, Your Honor, we believe that his age, which is, approximately, 67 years old, will be brought up before this Court as a mitigation factor. However, Your Honor, we believe it's quite the opposite, it's an aggravating factor.

As we've argued before, this is not a young man. This is not a lapse in judgment. This is a pattern.

And turning to flight risk, Your Honor, we note, in this case, we acknowledge the defendant has been in the same residence. He's a U.S. citizen. He lives in Puerto Rico.

However, we do note that in the execution of the search warrant, $104,000 in cash were also recovered. None of that was reported to probation. That's not reflected in his

assets.

There is no explanation at this time as to why he has that large sum of money. It's certainly not consistent with the reported income that he gave to the U.S. Probation Office, and it's not consistent with the tax information that he filed with the state as well.

In addition to that, we believe that he has assets which could contribute to a flight risk. And as far as the flight risk itself, Your Honor, we do know, in addition to the charges that he's pending right now, he is also the target of an ongoing investigation. He's aware that he's a target of an ongoing investigation. So he's not just looking at possible penalties for the (g)(1), he's also looking at potential additional penalties.

THE COURT: Okay. Anything else?

MS. OLINGHOUSE: Not at this time, Your Honor.

THE COURT: All right.

Okay. Ms. Earl?

MS. EARL: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. EARL: Your Honor, Mr. Garcia has been approached by the FBI more than one time in the last year because he is, allegedly, a construction worker who was working on the governor's in-law's house in La Parguera. That's how this started.

I have a copy of the search warrant that -- the, the receipt that was given to the wife in this case when the FBI searched. They're searching for documents related to his construction practices: laptops, receipts, other things like that. No listing of firearms. No listing that this person is dangerous or anything that would be dangerous in there.

They go to the house, and they find old revolvers on top of an AC console that's on the wall outside the house and 143 bullets in a sock that weren't even loaded in the firearms. So they knew about this person, and they've known about him for a while. So his dangerousness, and if he's going to be such a dangerous person to the community, when they have approached him at his home on multiple times, just doesn't, I think, vibe with the history of this case.

The reason they're approaching Mr. Garcia is about La Parguera and the construction that was going on there. And when they searched the house, they find these revolvers, not loaded, bullets separate in a sock, in a place that's, like, on top of an AC console, sort of outside the house in -- it's difficult to explain, Your Honor, but like a concrete structure on -- that sticks out from the roof, from the AC part that's on the outside wall of the bedroom.

Now, Your Honor, so to review the, the search warrant for the house and for Mr. Garcia, the FBI wasn't concerned about Mr. Garcia being an armed person or a drug-trafficker or

anything of that nature. They wanted information, and they're certainly, you know, entitled to do so, about their investigation into the construction activities in La Parguera.

The charges in the search warrant are related to the Clean Water Act, to things about the construction in La Parguera, nothing to relate, to indicate that they were concerned in searching his house that he could be a dangerous person. Aha, upon searching the house, we find these old firearms. Now we have a 922(g)(1).

I think that there are certainly evidentiary issues for the government in this case under both *Bruen* and *Rehaif*. That's not for the purpose of this Court today, but a man with a fourth-grade education with a 25-year-old prior, saying that he knew he couldn't possess firearms, is something that the defense will certainly explore in the future.

Your Honor, Mr. Garcia is 67 years old, and he does have two priors that are violent in nature, one of which he volunteered to the probation office. There is no record of it because it's a juvenile case. Maybe he was officially charged and sentenced at 18 years old, but he was a juvenile.

What he reported, and the government did not include in their proffer, is that Mr. Garcia was given an involuntary homicide when he killed his stepfather, after his stepfather was beating his mother to death, when he was a teenager. He was given seven years of probation as a juvenile at the time,

which he completed successfully. So that's the first one.

Vigilante justice is not appropriate, we know. But I wanted to give the Court some context that when he was a kid, his stepfather was beating his mother to death, and he intervened and got seven years probation.

As he became an older man, we know he was 40, he became a crack and heroin addict. And he, high on crack, stabbed a person, no firearms. If Your Honor checks the article under which he was charged and which he was sentenced, it's for a stabbing. If you check the murder laws from that date, he got the lowest possible sentence that one can get for second-degree murder, which is only given if mitigating circumstances appear, 12 years.

Now, I don't know exactly what happened, and that information isn't available to us at this time. But one can read between the lines and think that this was a person, who in the throes of addiction, made a horrible mistake and stabbed someone whom, my understanding after speaking to my client, was also an addict.

There was a fight among addicts, and it resulted in another person, unfortunately, dying. My client got 12 years, and because of his good behavior, was out in 7.5 years. He was released, if I'm not mistaken, Your Honor, in 2005. That was 20 years ago.

He has been clean, the government said 10 years. No,

he has been clean for over two decades.  He says he stopped using controlled substances over 20 years ago, approximately, 20 years ago.  He used crack cocaine and heroin for 10 years.

I don't have information about the other charge that the government is bringing to the Court's attention, and clearly, neither does probation, given all the powers they have to investigate criminal history.  So I, I can't speak to that one, Your Honor.  But the two we do know about, we can put into context.

Why, in 20-plus years, I haven't heard why he's still a danger to the community.  20 years being clean, living in the same home, doing the same job, which is construction, which is the reason he was being investigated, not because he was a murderer, because he possessed firearms or because he was a drug-dealer, but because he was doing construction that the government deemed illegal.

Those charges are either misdemeanors, if they are brought before a grand jury or charged by an Information, and one of them is a felony that has no more than three years incarceration.  So big difference between what we're facing here and there.

My client, Your Honor, has been a resident of Lajas his entire life, other than the seven years he was incarcerated.  He had a son in Miami, who's grown, a daughter who's grown who lives in Lajas.  His partner, Yolanda, is here

in Court.  She's brought with her the titles to the cars and all the documents that she has to support his release, and she could be interviewed by pretrial services today.

He lives in the house that was subject of the search warrant his entire adult life.  He lives there with Yolanda and with her grandfather, who is bedridden and who Yolanda takes care of.

My client has been doing construction his entire life.  The $104,000 were seized by the government.  That represents my client's entire life savings, Your Honor.  It doesn't mean that you shouldn't be filing tax returns.  I get it.

But I also think there is a cultural effect to this that this Court is well aware of for people of a certain generation saving money in that way.  This money has been seized.

In addition to the 104,000, he receives about $220 in social security.  This isn't someone with a pension.  This isn't someone who, you know, is receiving any kind of monthly income, other than the very little social security he receives.

So $104,000, if he were to "say let's" live 20 more years, is going to represent $5,000 a year.  That's poverty wages, basically.  And he doesn't have that money anymore, so he can't access it.  It was seized by the government.

Your Honor, this -- I, I, I get the government's

point that in the past he had drug addiction, and he had a violent incident in his past. But I, I just don't think that there is any reason that he -- they can argue that, in the past 20 years, he presents a danger to the community, when he's been living and working in Lajas, and for the past year, been known to the government and to the FBI.

He presents no history of violence, as far as between partners. He was, prior to Ms. Yolanda, he was with his ex-partner for 16 years, and he was widowed when she passed away. And then he had a long-term relationship with the mother of his two adult children.

He is a great-grandfather. He has grandchildren, and he has great-grandchildren. He lives in the house in the search warrant, a two-bedroom, two-bath, small home in Lajas. His cars are from the 1990s and a 2018 Toyota.

This isn't someone with extensive resources, with some massive criminal network to be able to, you know, fly or flee the country. He has no passport. He's never left the country.

And he's briefly traveled, as I mentioned, to Miami, where he has a son. And if I'm not mistaken, I think he told me he had been to the Bronx and Connecticut in the eighties, but no real stateside travel either.

Your Honor, obviously, the Bail Reform Act says the defendant shall be released, unless the government can prove by

clear and convincing evidence that he doesn't present a danger to the community, and there are absolutely no factors that the Court could create to try and assuage the danger to the community.

Obviously, in a perfect world, we could give guarantees. But we don't live in a perfect world, and the Court can't guarantee anything. But the Court can do the best in its power to ensure that Mr. Garcia doesn't present a danger to his community in Lajas. I would say he doesn't. He's been there drug-free for 20 years, working.

So we would adopt the pretrial services report. If the Court wishes to include a third-party custodian, Ms. Yolanda Pantoja is here, and she can be interviewed. She stays at home and takes care of her, as I mentioned, the grandfather, so she's there at the home.

Your Honor, I also know this is proffer, but my client was cooperative during arrest. To my knowledge, nothing violent or particularly difficult happened. He, as the government mentioned, and he admitted, the firearms, that he had them. He told the agents about that.

He has medical conditions, of course, that are listed, nothing super serious, but something the Court can certainly take into consideration.

I certainly think the Court can either adopt the conditions by pretrial or even impose some stricter ones, if it

felt that was necessary. Though, I don't, I don't think anything further is needed than the $10,000 unsecured and that he cannot leave.

This is a person who had a troubled past a long time ago. And I know they're saying: Well, he was 40; he was a grown man. But he's 67 now, so 27 years ago. He's cleaned up his life and has been sober, as I mentioned, for 20 years, with no problems with the law since.

They mentioned something in 2011, but, Your Honor, that was dismissed. And if I'm not mistaken, Rule 247(b) is the prosecutor's choice to dismiss it, so I'm not even going to get into the, the 2011 arrest for, for threats.

If the Court has any questions, we're here to answer them, but that would be our proffer. And I think the Court can certainly craft conditions that would assure the Court -- the community's safety, especially the community in Lajas, where my client lives and where his family is.

MS. OLINGHOUSE: Your Honor, may I respond --

THE COURT: Yes.

MS. OLINGHOUSE: -- Briefly?

THE COURT: Uh-huh.

MS. OLINGHOUSE: Just as a quick matter, obviously, the search warrant wasn't for firearms. We assume that someone is complying with the law. We don't assume we will find firearms just because somebody has a conviction. So the

government certainly was surprised that, at 67 years old, after two murders, the defendant still was possessing firearms in violation of the law.

And as far as clarifying just a few facts for the record -- and I understand, obviously, Ms. Earl has not received discovery at this point -- all of the ammunition was not in a sock. There were two boxes of ammunitions. Some of the ammunition was in a sock.

As I said, it's the government's position that this was accessible. It was next to the firearms.

THE COURT: I'm not aware of the storing ammunition in the sock defense so --

MS. OLINGHOUSE: Yes, Your Honor.

THE COURT: I sat here very, very quietly listening to the argument, and I heard a lot of justification, mitigation, excuses. But I don't know where the ammunition in the sock is going to help matters.

MS. EARL: Your Honor, my point is, they weren't loaded firearms ready for use.

THE COURT: They weren't loaded, but they're still firearms.

MS. EARL: I understand.

THE COURT: But vintage. What does "vintage" mean? Still -- was the ammunition for those firearms?

MS. OLINGHOUSE: Yes, Your Honor.

THE COURT: Okay.

MS. EARL: I know, Your Honor, but a lot of times the Court will point out a firearm being loaded, ready for use, in the pants of someone or ready in the, in the glove compartment or easy access. And my point being that, you know, this -- these weren't loaded next to his bed, is the point I'm trying to make.

We're not denying that they were the ammunition that was listed, but my point wasn't to create a defense that that doesn't mean they're not firearms. Just that, you know, Mr. Garcia didn't have them next to his bedside with three fully-loaded revolvers ready for defense.

THE COURT: Yes.

MS. OLINGHOUSE: Another clarifying point, Your Honor, counsel mentioned that his prior incident, referring to the second-degree murder, none of this was related to his partners. The government, during Defendant's interview, learned otherwise.

According to Defendant himself, we believe that the second-degree murder conviction was, in fact, his partner. That's information that he gave to the FBI agents. We don't have the full police files yet. That's not something that's available in the criminal history records that we have.

But, once again, Your Honor, these are his admissions, that he killed his partner, 40 years old. So we do

believe that he has a violent nature and also a violent nature with his partner.

As well as, Your Honor, we just want to reiterate again, the issue with the statements that are being proffered to the Court right now, we believe, come primarily from the defendant. And I think the very fact that the government has one set of statements and admissions from Defendant, and defense counsel has a second set of admissions, which are certainly more favorable to him, including that he was 14, but the charges were suddenly filed at 18, all of this information is unverified.

The very fact that he's giving inconsistent statements within the span of 48 hours or so, I do believe is indicative of the fact that, once again, he cannot be trusted on conditions of release. This is someone that's giving different versions of events, different admissions.

And, once again, Your Honor, the fact that he hasn't been arrested in 20 years is also not indicative that he hasn't done anything for 20 years. That's a fact or an inference, could be made either way. That's all, Your Honor.

MS. EARL: Your Honor, as to the juvenile, I -- I'm not -- he has just told me he was a juvenile. My thing to argue against the 18 years old is, because there is no record listed by probation, it leads me to think that he was a juvenile upon the commission, not -- I don't know if he was 18

when he was charged, and it was committed. But because there is no record of it, it lead -- and my client informed he was a juvenile to me, and informed he was a juvenile to probation, makes me think that he was a juvenile when the crime itself occurred.

MS. OLINGHOUSE: The arrest that we have, Your Honor -- and probation, I believe I forwarded the information as of a few minutes ago -- it just comes up: At 18 years old, first-degree murder arrest. I agree with counsel, I don't know if it's the same arrest.

I assume there isn't a third murder arrest, but it was filed at 18. It's reflected in the Puerto Rico Police Bureau record. The details, I don't know. But he has a first-degree murder arrest at 18, and he confessed to FBI agents he committed a murder at 18.

THE COURT: Okay. It's not going to make a difference one way or the other whether he did this at 14 or 18. The fact of the matter is that what is before the Court is an individual who has committed two murders.

The first one, Ms. Earl, you, you try and mitigate saying that he was -- he, he killed the stepfather, who was beating his mother. Certainly, a commendable defense of others, but not a perfect defense of others, because he was convicted of manslaughter. So there is something not so innocent about his actions at that time.

The second murder, you know, the fact that I'm even entertaining the question of bail for someone who has been convicted and served time for two murders is kind of surprising.

The attempts by the defense to mitigate the possession of firearms by saying that they're vintage is totally unpersuasive to the Court. A vintage firearm kills just as well as a brand new, shiny, clean firearm.

The fact that he is a felon, he should know better than having firearms. He should know better than having two firearms. He should certainly know better than having three firearms, as well as 143 rounds of ammunition.

I don't share your description of his life about being law-abiding, because now, most recently, he's demonstrated that he isn't able to, to follow, I mean -- I'm going to spare everyone any, any commentary here. I find that the government has demonstrated by clear and convincing evidence that he is a danger to the community, not necessarily a risk of flight, but being a danger to the community is enough for him to remain detained. And I will issue a detention order that explains that in more detail.

Anything else?

MS. EARL: Your Honor, just that our objection to the Court's ruling is noted on the record, and we'll file one in writing once we receive the Court's reasoning.

THE COURT:  It's noted.

All right.  Anything else?

MS. OLINGHOUSE:  Nothing further, Your Honor.

THE COURT:  Okay.

(Proceedings concluded at 2:42 p.m.)

-oOo-

UNITED STATES DISTRICT COURT )
                               )  ss.
DISTRICT OF PUERTO RICO        )

**REPORTER'S CERTIFICATE**

I, CINDY LEE BROWN, do hereby certify that the above and foregoing, consisting of the preceding 22 pages, constitutes a true and accurate transcription of the audio-recording provided, as recorded by the courtroom deputy clerk, and is a complete transcript of the proceedings to the best of my ability.

Audio proceedings were recorded and were provided to this reporter by the U.S. District Court, and this certified reporter accepts no responsibility for any events that occurred during the above proceedings, for any inaudible and/or indiscernible responses by any person or party involved in the proceeding or for the content of the audio-recording provided.

Dated this 4th day of November, 2025.


/s/ Cindy Lee Brown
_____
CINDY LEE BROWN, CSR, RPR, FCRR